

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-9-2005

# Santana Prod Inc v. Bobrick Washroom

Precedential or Non-Precedential: Precedential

Docket No. 03-1845

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

## Recommended Citation

"Santana Prod Inc v. Bobrick Washroom" (2005). *2005 Decisions.* Paper 1512.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1512

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos: 03-1845/2283/2481

SANTANA PRODUCTS INC.,
Appellant - No. 03-1845

v.

BOBRICK WASHROOM EQUIPMENT, INC.;
BOBRICK CORPORATION; THE HORNYAK GROUP
INC.;VOGEL SALES COMPANY; SYLVESTER &
ASSOCIATES, LTD.;FRED SYLVESTER

SANTANA PRODUCTS INC.,
Appellant - No. 03-2283

v.

BOBRICK WASHROOM EQUIPMENT, INC.;
BOBRICK CORPORATION; THE HORNYAK GROUP
INC.;VOGEL SALES COMPANY; SYLVESTER &
ASSOCIATES, LTD.;FRED SYLVESTER

SANTANA PRODUCTS INC.

v.

BOBRICK WASHROOM EQUIPMENT, INC.;
BOBRICK CORPORATION; THE HORNYAK GROUP
INC.;VOGEL SALES COMPANY; SYLVESTER &
ASSOCIATES, LTD.;FRED SYLVESTER


BOBRICK WASHROOM EQUIPMENT, INC.;
BOBRICK CORPATION,
Appellants - No: 03-2481

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 96-cv-01794 )
District Judge: Thomas I. Vanaskie, Chief Judge

_____

Argued March 23, 2004

Before: ROTH, AMBRO and CHERTOFF, <u>Circuit Judges</u>


(Opinion filed:    February 9, 2005    )

William E. Jackson, Esquire (Argued)
B. Aaron Schulman, Esquire
Stites & Harbison
1199 North Fairfax Street
TransPotomac Plaza, Suite 900

Alexandria, VA 22314

Gerald J. Butler, Esquire
142 North Washington, Suite 800
Scranton, PA 18503

**Counsel for Appellants**

Carl W. Hittinger, Esquire (Argued)
Stevens & Lee
1818 Market Street, 29ᵗʰ Floor
Philadelphia, PA 19103
Walter F. Casper, Jr., Esquire
35 South Church Street & &th Avenue
Carbondale, PA 18403

**Counsel for Appellees**

O P I N I O N

ROTH, Circuit Judge:

In order to persuade government architects to specify Bobrick's toilet partitions for use in government projects,

3

Bobrick Washroom Equipment, Inc.,[1] its architectural representative, the Hornyak Group, Inc., and its sales representative, Vogel Sales Co., were telling architects that the partitions of Santana Products, Inc., posed a fire hazard under fire safety codes. As a result, Santana brought claims against Bobrick, Hornyak, and Vogel for anti-trust violations of §§ 1 and 2 of the Sherman Act, for false advertising under the Lanham Act, and for state law tortious interference with prospective contract. The defendants allegedly violated the Sherman Act by conspiring to induce government architects to specify Bobrick's product, which in turn created a restraint of trade. They allegedly violated the Lanham Act by giving the government architects false information about the fire hazards of Santana's product. They allegedly tortiously interfered with a prospective contract of Santana's by inducing an architect to specify Bobrick's product and remove Santana's product from a specification.

The defendants asserted numerous defenses. For example, they contended that they could not be held liable for Santana's claims because they were merely petitioning the government about a safety matter, an action which was protected by the First Amendment of the U.S. Constitution. They also challenged the timeliness of Santana's claims, arguing that the claims were barred either by the statute of limitations or the doctrine of laches. The District Court granted summary judgment in favor of the defendants on the Sherman Act claims and the tortious interference with prospective contract claim and denied defendants' motion for summary judgment on Santana's Lanham Act claim. *Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 249 F.Supp. 2d 463 (M.D. Pa. 2003). We will affirm the District

---

[1]Bobrick Corporation is the parent company of Bobrick Washroom Equipment. We will refer to them collectively as Bobrick.

Court's entry of summary judgment in favor of the defendants on Santana's Sherman Act § 1 claim and its tortious interference with prospective contract claim.[2] However, because we conclude that the Lanham Act claim is barred by the doctrine of laches, we will reverse the granting of summary judgment on that claim.

## I. FACTUAL BACKGROUND

The following facts are taken primarily from the District Court's very thorough opinion.[3]

### A. The Toilet Partition Industry

Santana and Bobrick manufacture toilet partitions.[4] Toilet partitions are made of different materials, including metal, stainless steel, plastic laminate, solid phenolic, and high density polyethylene (HDPE). The partitions are installed in public buildings, such as government offices, schools and arenas, as well as in private commercial buildings. The competitors in the toilet partition industry must engage in competitive bidding for government contracts. Before competitors bid for contracts, the architect or "specifier" for the project specifies the materials to be used in the government project. Only the companies that manufacture materials that match those specified may bid on the contract. A manufacturer will lobby architects and specifiers to

_____

[2]Santana does not appeal the § 2 claim, so we do not address it.

[3]The parties' appeals – Nos. 03-1845, 03-2283, and 03-2481 – were consolidated. 03-1845.

[4]Toilet partitions are also referred to as toilet compartments.

persuade them to specify its product instead of its competitors' products. Once the material for an element of a contract has been specified, the companies that manufacture the specified material then compete on price.

Santana makes toilet partitions composed of HDPE. As of mid-1989, Santana and four other companies offered HDPE partitions. Bobrick makes a partition composed of solid phenolic and a partition composed of plastic laminate.

## B. The ASTM E-84 Test and Santana's HDPE Partition

The American Standard Test Methods (ASTM) E-84 test is commonly used in the construction industry to test materials for flammability. The two characteristics that the ASTM E-84 test analyzes are "flame spread," which is the speed at which a flame spreads across the test material, and "smoke developed," which is the rate at which smoke develops once the material starts to burn. The E-84 test generates indices that compare the "flame spread" and "smoke developed" characteristics of the test material to those of red oak and inorganic reinforced cement surfaces under the same fire exposure conditions.

Building codes and the National Fire Protection Association's (NFPA) Life Safety Code 101 use the ASTM E-84 test indices to generate fire ratings for materials. A Class A fire rating is the best, Class B is second best, and Class C is third best. Any material that does not fit into one of these ratings is considered unrated. The flame spread value for each class differs, but all classes require a "smoke developed" value of less than 450. The NFPA Life Safety Code 101 requires the material to meet a specific fire rating depending on the manner in which the material is used. For example, "interior finish" or "wall finish" materials are required to have a Class B rating whereas material that is

considered a "furnishing" or "fixture" can be unrated.[5]

In the early 1980's Santana developed the "FR" partition and used the ASTM E-84 test to assess the partition's fire rating. Santana advertised the FR partition in the Sweet's Catalogue[6] as having a Class A rating. The same advertisement claimed that Santana's HDPE partition had a Class B "flame spread." By the 1990's, Santana was phasing out the FR partition in favor of its HDPE partition. The HDPE partition, however, even though its "flame spread" value fit into the Class B rating, was precluded from being rated because of its high "smoke developed" value.

### C. The 1994 TPMC Litigation

Formica, one of the largest plastic laminate suppliers in the United States, along with its customers in the toilet compartment industry, all non-parties to this litigation, formed the Toilet Partitions Manufacturers Council (TPMC). According to Santana, the TPMC was concerned about the success Santana was having with sales of its HDPE partitions. The TPMC allegedly agreed to tell project specifiers that Santana's HDPE compartments were properly characterized as wall finishes but did not meet the NFPA's fire rating for wall finishes because of the high "smoke developed" value. Formica and Metpar, also a member of the TPMC, made a

---

[5]One issue in the present litigation is whether toilet partitions are finishes or furnishings/fixtures.

[6]The Sweet's Catalogue is a collection of catalogues of manufacturers' building products. Manufacturers pay to place their catalogues in the Sweet's Catalogue, and architects subscribe to and refer to the Sweet's Catalolgue before specifying materials to be used in construction projects. One section of the Sweet's Catalogue is devoted to toilet partitions.

videotape that, according to Santana, falsely depicted the flammability of Santana's HDPE partitions. The sales representatives of companies belonging to the TPMC showed the videotapes during sales presentations to architects.

Bobrick was not a member of the TPMC but did discuss with members of the TPMC the fire characteristics of HDPE. In July 1989, Bobrick received a copy of a Metpar fact sheet comparing HDPE to phenolic and stating that HDPE had a "smoke developed" rating exceeding fire standards. Alan Gettleman and Bob Gillis, both Bobrick employees, went on a plant tour of Formica and watched the videotape. Formica gave Bobrick a copy of the videotape in early 1990, and Bobrick forwarded the videotape to its architectural representatives.

In November 1994, Santana brought suit against Formica, Metpar, ten other toilet partition manufacturers, and the TPMC. The defendants in the present case were not named as defendants in the 1994 action. The 1994 action essentially alleged a conspiracy to use scare tactics to discourage the specification of HDPE partitions by falsely alleging that HDPE partitions posed a fire hazard. The parties to the 1994 action settled it in 1995.

## D. Bobrick's Marketing Campaign

Santana contends that Bobrick conducted an unlawful marketing campaign to persuade architects and specifiers that HDPE partitions did not meet building code requirements and posed a fire hazard. In addition to distributing the Formica videotape in 1990, Bobrick distributed to its sales representatives a "Technical Bulletin" (TB-73) which provided a comparison of ASTM E-84 tests performed on Bobrick's partitions and on HDPE partitions. Bobrick included the TB-73 Bulletin in its Architectural Manual from 1990 to at least 1994 and allegedly beyond. In 1992, Bobrick

produced a videotape entitled "You Be The Judge," which also included comparison tests of solid phenolic partitions and HDPE partitions. Some Bobrick representatives conducted live demonstrations during which they burned HDPE for architects. Bobrick placed an advertisement in the American School & University magazine in the early 1990's that described HDPE as a fire hazard and as far exceeding fire standards of the NFPA Life Safety Code. Bobrick also made comparison statements in its advertisements in the Sweet's Catalogue. Finally, Bobrick created slide presentations and sales scripts for use by its representatives that portrayed HDPE as a fire hazard compared to Bobrick's partitions.

## II. PROCEDURAL HISTORY

Santana filed a complaint in the United States District Court for the Middle District of Pennsylvania against Bobrick, Hornyak, Vogel, Sylvester & Associates, Ltd., and Fred Sylvester.[7] Santana asserted claims under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, the false advertising provisions of the Lanham Act, 15 U.S.C. § 1125(a), and Pennsylvania state law for tortious intererence with prospective contract. After three years of discovery, the parties filed cross-motions for summary judgment.

---

[7]Santana's claims against Sylvester & Associates, Ltd., and Fred Sylvester were dismissed for lack of personal jurisdiction. Santana subsequently filed an action against them in the District Court for the Eastern District of New York. The decision in that case is reported at *Santana Products, Inc. v. Sylvester & Assoc., Ltd.*, 121 F. Supp. 2d 729 (E.D.N.Y. 1999).

Bobrick filed a Third-Party Complaint against Formica on June 1, 1998, bringing claims for contribution, indemnification, fraud, and negligent misrepresentation, but that complaint was dismissed for reasons unimportant to this appeal.

The defendants argued to the District Court that they were immune from liability for all of Santana's claims by reason of the *Noerr/Pennington* doctrine. The District Court agreed, holding that "the *Noerr/Pennington* doctrine is indeed applicable to all of Santana's claims." *Santana*, 249 F. Supp. 2d at 470. The court stated that "to the extent that Santana premises its damages on decisions made by public officials or their agents . . . who approved specifications for phenolic toilet partitions or disapproved specifications for HDPE toilet partition, defendants are immune from liability" *Id.* at 487. The court held that any recovery Santana might be entitled to would be limited to the effects on the private sector of defendants' marketing campaign. *Id.* at 470.

The District Court, however, ultimately granted summary judgment in favor of all defendants on Santana's Sherman Act § 1 claim. As to Hornyak and Vogel, the court held that they could not be liable for a § 1 violation as a matter of law because they were "captive sales representatives of Bobrick."[8] *Id.* As to Bobrick, even though the court found the requisite element of concerted action between Bobrick and the members of the TPMC, *id.* at 507-08, the court nevertheless held that Bobrick's marketing campaign was not an unreasonable restraint on trade and that, even if it were, Santana had only showed a *de minimus* effect on competition. *Id.* at 470. The court also granted summary judgment on Santana's Sherman Act § 2 claim in favor of defendants. *Id.*

---

[8]The court also found that, because there was no evidence that Hornyak and Vogel were marketing to the private sector, they were entitled to summary judgment on all claims based on their *Noerr/Pennington* defense. *Santana Products, Inc.,*, 249 F. Supp. 2d at 494 n. 24.

10

at 470, 505-06.[9]

Turning to Santana's false advertising claim under the Lanham Act, the District Court rejected Bobrick's timeliness defenses. *Id.* at 500-01. The court concluded that the claim was not barred by either the statute of limitations or the doctrine of laches but then held that Santana's recovery under the Lanham Act, if at all, would be limited to violations occurring within the applicable statute of limitations period, which the court held to be the six year "catch-all" limitations period under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL). *Id.* at 500. The court concluded that summary judgment was not appropriate on the Lanham Act claim as to Bobrick because there were fact issues as to the literal falsity of statements made in videos, advertisements, and other marketing material. *Id.* at 471, 525-39.

Finally, the District Court granted summary judgment in favor of the defendants on Santana's tortious interference with prospective contract claim. The court held that the *Noerr/Pennington* doctrine shielded the defendants from liability, *id.* at 542, and alternatively found that Santana did not "present evidence of the loss of a prospective contract with a non-public customer within the one-year limitations period." *Id.* at 470-71.

## III. JURISDICTION AND STANDARD OF REVIEW

The District Court certified its order for immediate

---

[9]The District Court relied on the analysis in *Santana Products, Inc. v. Sylvester & Assoc., Ltd.*, 121 F. Supp. 2d 729 (E.D.N.Y. 1999) and held that Santana's "shared monopoly" claim was not a cognizable § 2 claim. *Santana Products*, 249 F. Supp. 2d at 470. Santana does not appeal this ruling.

appeal pursuant to 28 U.S.C. § 1292(b).[10] We granted Santana's and Bobrick's petitions for permission to appeal on April 17, 2003.

Bobrick appeals the District Court's finding that Santana's Lanham Act claim is not barred by the statute of limitations or the doctrine of laches, and Santana appeals the District Court's holding that the *Noerr/Pennington* doctrine is applicable to Lanham Act claims.[11] We raised the question of our jurisdiction of Bobrick's appeal pursuant to § 1292(b) and asked the parties to provide supplemental briefing on this issue even though a different panel of this Court had already granted Bobrick's petition for permission to appeal.[12]

We conclude that we have appellate jurisdiction to consider Bobrick's appeal. "[A]ppellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to

---

[10]28 U.S.C. § 1292(b) gives the courts of appeals discretionary jurisdiction over a district court order "[w]hen a district judge . . . shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

[11]We have jurisdiction over Santana's appeal in No. 03-1845 pursuant to 28 U.S.C. § 1291 because the District Court entered a final judgment pursuant to Federal Rule of Civil Procedure 54(b) on Santana's Sherman Act claims and its claim for tortious interference with prospective contract.

[12]Even though "other factors [may] counsel in favor of deferring to the motions panel," "[t]he merits panel is certainly entitled to reexamine the decision of the motions panel." *In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 279-80 (3d Cir. 1996).

the particular question formulated by the district court." *Yamaha Motor Corporation, U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996). We can "address any issue fairly included within the certified order" because the order is appealable, not the controlling question of law. *Id.*; *see also Morris v. Hoffa*, 361 F.3d 177, 197 (3d Cir. 2004).

The District Court's order outlined the manner in which it was handling each of Santana's claims, including Santana's Lanham Act claim. The court's opinion explains the reason it chose to certify the order. It stated that "[t]he motions present several important and difficult issues for which there is not controlling precedent in this Circuit." *Santana*, 249 F. Supp. at 470. The District Court was referring to its decision that the *Noerr/Pennington* immunity defense applied not only to Santana's Sherman Act and state law claims, but also to Santana's Lanham Act claim. The District Court also believed that Bobrick's timeliness challenge to Santana's claims, "especially its Lanham Act cause of action, to which the doctrine of laches applies and for which there is no controlling precedent in this jurisdiction" was "substantial." *Id.*

The issue of the timeliness of Santana's Lanham Act claim is clearly included in the District Court's order, and we are satisfied that we have appellate jurisdiction to entertain Bobrick's appeal. Moreover, by addressing the laches issue now, we avoid deciding a constitutional issue. For the reasons we will articulate, it will not be necessary for us to consider the *Noerr/Pennington* doctrine's applicability to Lanham Act claims. *See Spicer v. Hilton*, 618 F.2d 232, 239 (3d Cir. 1980). ("[I]t is well established that courts have a duty to avoid passing upon a constitutional question if the case may be disposed of on some other ground.").

We exercise plenary review over the District Court's decision to grant summary judgment and will use the same test applied below. *Belitskus v. Pizzingrilli*, 343 F.3d 632-

13

639 (3d Cir. 2003). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment is not appropriate, however, 'if a disputed fact exists which might affect the outcome of the suit under the controlling substantive law.'" *Belitskus*, 343 F.3d at 639 (quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993)). The moving party bears the burden to show an absence of any genuine issues of material fact and can meet this burden by showing that the non-moving party "has failed to product evidence sufficient to establish the existence of an element essential to its case." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1000 (3d Cir. 1994).

## IV. DISCUSSION

### A. Sherman Act § 1 Claim

Santana contends that the District Court erred when it held that the *Noerr/Pennington* doctrine[13] shielded Bobrick,

---

[13]The *Noerr/Pennington* doctrine protects "the right of the people . . . to petition the government for a redress of grievances." U.S. CONST. amend. I. Defendants in antitrust cases are immune from liability when they are exercising their First Amendment right to petition. Actions aimed at "influenc[ing] the passage or enforcement of laws" are immune from Sherman Act liability even if the antitrust defendant intends to restrain trade or to monopolize, so long as the "restraint on trade or monopolization is the result of valid government action." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135-36 (1961).

Hornyak, and Vogel from liability under § 1 of the Sherman Act. As to this claim, however, there is no need to decide whether Bobrick, Hornyak, and Vogel are entitled to immunity under the *Noerr/Pennington* doctrine. Even if they were entitled to immunity, Santana's § 1 claim fails because we conclude that there has been no restraint of trade.

Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. An antitrust plaintiff must first prove concerted action by the defendants.[14] *Petruzzi's IGA*

---

*Noerr/Pennington* immunity extends beyond attempts to influence the passage and enforcement of laws and applies equally to efforts to influence administrative agency action, *see United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), and efforts to access the court system, *see California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). The *Noerr/Pennington* doctrine protects antitrust defendants' rights to "freely inform the government of their wishes" and "to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors," *Noerr*, 365 U.S. at 138-39.

Santana argues that the defendants' marketing campaign is not petitioning activity and is therefore not protected by the doctrine. Santana argues that, even if the marketing campaign is considered petitioning activity, the defendants are not entitled to *Noerr/Pennington* immunity because of the alleged fraudulent nature of the defendants' campaign. Finally, Santana argues that *Noerr/Pennington* immunity does not extend to situations where, as here, the government is the purchaser of the products at issue.

[14]The District Court held that Santana proved the concerted action element as to Bobrick, and Bobrick does not challenge

*Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1229 (3d Cir. 1993). A plaintiff must next prove that there is a restraint on trade and that the restraint is unreasonable. *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5 (1958).

Santana argues that the defendants created a restraint on trade by engaging in a group boycott. Santana's theory is as follows: Bobrick and the other members of the TPMC conspired to agree upon and enforce against business rivals a single product standard that excluded HDPE technology." Because of a TPMC agreement to stop supplying HDPE partitions, three TPMC members left the HDPE market, leaving only two HDPE suppliers. This agreement was an unreasonable restraint of trade because it restricted the output of HDPE partitions. The defendants' concerted action reduced the number of HDPE compartment specifications that Santana could bid for. In addition, the conspiracy's emphasis

---

this finding. Santana, however, does appeal the District Court's conclusion that it did not prove concerted action as to Hornyak and Vogel. Santana seeks to hold Hornyak and Vogel liable under § 1 based on their relationship and interaction with Bobrick. Hornyak and Vogel argued to the District Court that they were incapable of conspiring with Bobrick as a matter of law because they sold Bobrick's products exclusively. The court, relying on the Supreme Court's decision in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), and our decision in *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125 (3d Cir. 1995), held that, as a matter of law, Hornyak and Vogel were incapable of conspiring. 249 F. Supp. 2d at 505-06.

As with the *Noerr/Pennington* issue, we do not need to resolve this question because, even if we were to hold Santana did prove concerted action as to Hornyak and Vogel, Santana's § claim would still fail.

16

on the failure of HDPE compartments to comply with the NFPA/ASTM standards had a tendency to "persuade" or "coerce" specifiers because such private codes are published and are used by various segments of the construction industry. The conspiracy resulted in excluding HDPE compartments from the market and depriving consumers of a superior product.

We fail, however, to find "restraint" in this alleged activity – and without a "restraint," there is "no restraint of trade." *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397 (7th Cir. 1989). Here, Santana's antitrust claim is built on allegations that the defendants criticized the safety of HDPE partitions. It is undisputed that the defendants informed potential customers that Santana's product presented safety hazards. Santana has not, however, demonstrated that Bobrick imposed any restraints on trade. Santana does not allege that Bobrick engaged in coercive measures that prevented Santana from selling its products to any willing buyer or prevented others from dealing with Santana. Moreover, Santana's allegations of fraud in the manner in which the hazards of HDPE were portrayed are irrelevant because "deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." *Noerr*, 365 U.S. at 145; *cf. Schachar*, 870 F.2d at 399 ("antitrust law does not compel your competitor to praise your product or sponsor your work.").

The court's description in *Stearns Airport Equipment Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999), of this type of product promotion is instructive:

> All of these arguments made by FMC to its potential customers may have been wrong, misleading, or debatable. But they are all arguments on the merits, indicative of competition on the merits. To the extent they were successful, they were successful because

17

the consumer was convinced by either FMC's product or FMC's salesmanship. FMC – unsurprisingly – wanted to be picked over Stearns on a contract . . . Without a showing of some other factor, we can assume that a consumer will make his decision only on the merits. To the extent a competitor loses out in such a debate, the natural remedy would seem to be an increase in the losing party's sales efforts on future potential bids, not an antitrust suit.

170 F.3d at 524-25

Here, the defendants' marketing campaign was aimed primarily at persuading government architects to specify Bobrick's materials instead of materials made from HDPE. It was the architects who would make the ultimate decision of which product to specify for use in a particular project. This is classic competition on the merits of a product. In no real sense is Santana excluded from the toilet partition market. Santana remains free to tout its product to the specifiers and remains equally free to reassure them that its partitions are superior to Bobrick's partitions and to prove Bobrick wrong with respect to the flammability of HDPE partitions. Toilet partition buyers are in no way constrained from buying HDPE toilet partitions. "The central insight . . . is that jockeying over specifications . . . is a valid form of competition . . .. This behavior was 'simple salesmanship' that enhanced rather than subverted competition on the merits. If . . . [Santana] was 'excluded,' it was excluded by . . . [Bobrick's] superior product or business acumen." *Stearns*, 170 F.3d at 526.

In *Stearns*, under very similar facts, the court rejected the plaintiff's claim that the defendant's "attempts to convince independent government purchasers to adopt specifications in their favor prior to bidding are a violation of the antitrust laws." 170 F.3d at 522. The court reasoned that

18

"the alleged exclusionary conduct required the active approval of the consumer." *Id.* at 525. Unlike cases where the alleged exclusionary conduct leaves the consumer with no input whatever, the decision to specify "was always ultimately in the hands of the consumer." *Id.* There was no evidence that the defendant prevented the plaintiff from "pushing its arguments at the specifications phase." *Id.* at 526. Accordingly, the plaintiff was not excluded from competition.

In an earlier Fifth Circuit case, *Consolidated Metal Products, Inc. v. American Petroleum Institute*, 846 F.2d 284, 286 (5th Cir. 1988), the court came to the same conclusion under a different set of facts. Plaintiff sued the American Petroleum Institute (API), alleging the API excluded it from the market by delaying trade standard certification to its equipment. API was a standard-setting body that granted the manufacturer a license to display its monogram on the manufacturer's equipment if the API found that the equipment satisfied its standards. The plaintiff applied for, and was denied, a license to use APE's monogram. The court held that "a trade association that evaluates products and issues opinions, without constraining others to follow its recommendations," does not violate the Sherman Act by unfavorably evaluating a manufacturer's product. *Id.* at 292. The court noted that API approval was not required by law, equipment was sold frequently without it, and consumers were in no way constrained from buying the plaintiff's products. The plaintiff was not excluded "in a real sense" from the market because it was still free to sell its products and consumers were free to buy them. *Id.* at 292. The court stressed that manufacturers of equipment still had the ability, even without an API monogram, to market the quality of their products. *Id.* at 296.

The Seventh Circuit Court of Appeals in *Schachar* similarly found no restraint of trade. The plaintiffs were ophthalmologists who performed a surgical procedure labeled

19

"experimental" by the National Advisory Eye Council. 870 F.2d at 397. The American Academy of Ophthalmology endorsed the Council's position and issued a press release advising physicians and patients not to use the procedure until more research had been completed. The plaintiffs alleged that the press release was part of a conspiracy to restrain trade. The court held that there was no violation of the Sherman Act because there was no enforcement device that operated to restrain trade. None of the plaintiffs was prevented from doing the procedure and none was sanctioned for performing it. The court characterized the challenged action as "warfare among suppliers and their different products," not as restraint, but as competition. *Id.* at 399. The court cited *Consolidated Metal Products* with approval:

> If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation, but more speech – the marketplace of ideas.

*Id.* at 400.

Santana, on the other hand, relies on *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1998), to argue that the defendants "acted like a private standard-setting organization in adopting an anti-HDPE campaign, using false advertising videotapes to cause all types of customers . . . to refrain from purchasing HDPE compartments and to ensure that HDPE compartments were excluded from purchase specifications." Contrary to Santana's assertions, however, the TPMC is not a standard-setting body. It does not set, adopt, or enforce any industry standards for safety or other product characteristics. The NFPA is the relevant standard-setting organization, but Santana has not alleged that Bobrick and the TPMC members had any contact with the NFPA. Bobrick, Hornyak, Vogel, and the members of the TPMC

20

interpreted NFPA standards to their advantage. Santana has the right to do the same. What is lacking in these facts is some enforcement device that operates to restrain trade. The District Court properly distinguished *Allied Tube*:

> *Allied Tube* . . . involved the manipulation of the process of establishing an influential body's standards to exclude rival technology from the market . . .. [T]his case does not involve efforts to influence standard-setting or enforcement by a body with a cachet of influence. A campaign of persuasion of architects and specifiers that toilet partitions are subject to fire and smoke development standards for interior wall finishes does not constitute standard setting or enforcement . . ..

*Santana Products*, 249 F. Supp. 2d at 509-10.

Unlike *Allied Tube*, Bobrick's activity did not take place 'within the confines of a private standard-setting process." 486 U.S. at 506. Bobrick "confine[d] itself to efforts to persuade an independent decisionmaker" and did not "organize[] . . . [or] orchestrate[] the actual exercise of . . . decisionmaking authority in setting a standard." *Id.* at 507. The government officials making the decision to specify materials were disinterested, conducted their own fire safety tests before making decisions, and were susceptible to lobbying from all competitors in the toilet partition industry.

For the above reasons, we conclude that there was no restraint of trade.

## B. Lanham Act § 43(a) Claim

The defendants also claimed that they could not be

held liable for a violation of the false advertising provision of § 43(a) of the Lanham Act because of *Noerr/Pennington* immunity. The District court, after careful consideration, concluded that the *Noerr/Pennington* doctrine shields the defendants from liability under the Lanham Act. *Santana*, 249 F. Supp. 2d at 493. Santana appeals the District Court's holding, arguing that the court should not have extended the applicability of the *Noerr/Pennington* doctrine to false advertising claims brought under the Lanham Act. We will not address at this time the *Noerr/Pennington* doctrine's applicability to Lanham Act claims because we conclude that Santana's Lanham Act claim is barred by laches.

Santana brought this action on October 1, 1996. The Lanham Act does not contain a statute of limitations. Instead, the Act subjects all claims to "the principles of equity." 15 U.S.C. §1117(a). Bobrick challenged the timeliness of Santana's Lanham Act claim, asserting that Santana was complaining of conduct that occurred seven years before it filed the action and that Santana had settled its 1994 lawsuit against the TPMC and Bobrick was not a party to that litigation. Bobrick raised two timeliness defenses to Santana's Lanham Act claim – statute of limitations and laches.

It was proper for the District Court to use the most analogous statute of limitation as a guideline for determining whether the laches doctrine bars Santana's claim instead of focusing solely on whether Santana brought its claims within the applicable statute of limitations period. Courts commonly use the appropriate statute of limitations as a guideline in claims for false advertising under §43(a) of the Lanham Act. *See Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187 (2d Cir.1996); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F. 3d 813 (7th Cir. 1999); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F. 3d 829 (9th Cir. 2002). We also used the statute of limitations as a guideline. *See, e.g., University of Pittsburgh*

*v. Champion Products, Inc.*, 686 F.2d 1040 (3d Cir. 1982) (discussing relationship between statute of limitations and inexcusable delay element of laches in claim for false designation of origin of goods under § 43(a) of the Lanham Act).

Because the Lanham Act does not specify a statute of limitation, courts must "adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985). To do this, a court "must characterize the essence of the claim in the pending case, and decide which statute provides the most appropriate limiting principle." Id. at 268; *See also Malley-Duff & Assocs, Inc. v. Crown Life Ins.*, 792 F.2d 341 (1986). The court must decide which state claim is the "most appropriate" or "most analogous" to all claims that may be brought under § 43(a) of the Lanham Act. *Wilson*, 471 U.S. at 268. Courts must "choose the best out of the available candidates." *Malley-Duff*, 792 F.2d at 349. Bobrick urges us to conclude that the best choice is Pennsylvania's action for fraud, which has a two-year statute of limitation. Santana maintains, and the District Court determined that the UTPCPL, which has a six-year "catch-all" statute of limitation, is the best choice. We agree with the District Court.

To assert a claim for false advertising under § 43(a) of the Lanham Act, the plaintiff must prove that the defendant

use[d] in commerce any word, term, name, symbol, or device, or any

combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . .

in commercial advertising or promotion, misrepresents the nature,

characteristics, qualities, or geographic origin of his or her or another

person's goods, services, or commercial activities . . . 15 U.S.C. 1125(a). The plaintiff must prove that the commercial message is either literally false or, if not literally false, literally true or ambiguous with the tendency to deceive consumers. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002). If the plaintiff proves literal falsity, there is no need to show that the buying public was misled. *Johnson & Johnson-Merck Consumer v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F3d 125, 129-30 (3d Cir. 1994). Otherwise, the plaintiff must prove "that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience." *Id.* at 129.

To prove fraud in Pennsylvania, a plaintiff must prove six elements: 1) a misrepresentation, 2) material to the transaction, 3) made falsely, 4) with the intent of misleading another to rely on it, 5) justifiable reliance resulted, and 6) injury was proximately caused by the reliance. *Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534 (Pa. Super. Ct. 2003).

On the other hand, to prove "unfair methods of competition" and "unfair or deceptive acts or practices" under the UTPCPL, a plaintiff must demonstrate

(i) Passing off goods or services as those of another;
(ii) Causing *likeliness of confusion or of misunderstanding* as to the source, sponsorship, approval, or certification of goods or services;
. . .
(iv) Using *deceptive representations* or designations of geographic origin in connection with the goods or services;
(viii) Disparaging the goods, services or business of another by *false or misleading representation of fact*;
(ix) Advertising goods or services *with intent* not to sell them as advertised;

24

. . .

(xi) *Making false or misleading statements of* fact concerning the reasons for,

existence of, or amounts of price reductions;

. . .

(xxi) Engaging in any other *fraudulent or deceptive conduct* which creates a

likelihood of confusion or of misunderstanding.

73 P.S. § 201-2(4) (emphasis added).  The Supreme Court of Pennsylvania has held that a plaintiff bringing an action under the UTPCPL must prove the common law fraud elements of reliance and causation with respect to all subsections of the UTPCPL.
*Weinberg v. Sun Co., Inc.*, 777 A. 2d 442, 446 (Pa. 2001).

This Court in *Island Insteel, Inc. v. Waters* decided that, even though a Virgin Islands action for fraud was analogous to a trademark infringement claim brought under § 43(a) of the Lanham Act[15], the most analogous action in the Virgin Islands was one for

---

[15]To establish a trademark infringement claim under § 43(a), the plaintiff must prove that the defendant:

use[d] in commerce any word, term, name, symbol, or device, or any

combination thereof, or any false designation of origin, false or misleading

description of fact, or false or misleading representation of fact, which . . .

is *likely to cause confusion, or to cause mistake, or to deceive* as to the

affiliation, connection, or association of such person with another person, or as to

the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

15 U.S.C. § 43(a) (emphasis added).

deceptive trade practices. 296 F.3d 200, 204 (3d Cir. 2002). We noted that an

action for fraud requires proof of scienter, whereas an action for deceptive trade practices and an action for trade infringement do not. *Id.* We also noted that "a common law fraud claim *requires* a plaintiff to prove actual reliance," whereas "an action for deceptive trade practices simply requires proof that the practice at issue has the 'tendency or effect of deceiving or misleading consumers,' which more closely resembles the 'likelihood of confusion' element that is the touchstone of a § 43(a) claim." *Id.*

An action for fraud always requires the plaintiff to prove scienter, whereas the Lanham Act does not. The UTPCPL is in the middle. It encompasses causes of action in which the plaintiff must prove intent and causes of action in which the plaintiff need not prove intent. Furthermore, a false advertising claim under Lanham Act is different both from an action brought under the UTPCPL and from a fraud action in Pennsylvania

because it does not *always* require the plaintiff to prove that consumers have been misled. Analogies to state statutes or common law "are bound to be imperfect." *Wilson*, 471 U.S. at 272. As the District Court noted, the Lanham Act and the UTPCPL "' supplement[] rather than supplant[] traditional common law remedies with *per se* liability for a variety of unfair trade practices."' *Santana*, 249 F. Supp. 2d at 499 (quoting *Gabriel v. O'Hara*, 534 A.2d 488, 491 (Pa. Super. Ct. 1987)). Section 43(a) has multiple claims, as does the UTPCPL, while an action for fraud is narrower. The UTPCPL is the most analogous state cause of action that would encompass *all* claims brought under § 43(a) of the Lanham Act. *See Malley-Duff*, 792 F.2d at 347 (noting the need to "look[] to the federally created cause of action for a broader analogy that could encompass all claims brought thereunder in a given statute").

26

Bobrick cites our opinion in *Beauty Time, Inc. v. VU Sys., Inc*. 118 F.3d 140 (3d Cir. 1997), and argues that we have already held that Pennsylvania's fraud cause of action was most analogous to claims under the Lanham Act. However, *Beauty Time* involved a claim for fraudulent procurement of a trademark registration in violation of § 38 of the Lanham Act. Its holding is not, therefore, controlling because this case involves an action under § 43 (a). *See Island Insteel*, 296 F.3d at 208.

Bobrick also argues that the District Court erred by picking the UTPCPL six-year "catch-all" statute of limitations because in *Island Insteel* we rejected the plaintiff's argument there that a similar catch-all limitations period applied to a Lanham Act trademark infringement action. In *Island Insteel*, however, the plaintiffs did not "identify a specific statutory cause of action under Virgin Islands law that is analogous to their Lanham Act claim *and* is subject to the catch-all six year limitations period for actions upon a liability created by a statute that lacks a statute of limitations." *Id*. at 204 (emphasis added). In *Island Insteel*, we explained that the catch-all statute of limitations could have applied if the plaintiff had identified an analogous cause of action governed by that period. *Id.* at 209. Here, on the other hand, the most analogous cause of action – an action under the UTPCPL – is governed by the six-year "catch-all" limitations period. *See Gabriel v. O'Hara,* 534 A.2d 488, 495-96 (Pa. Super. Ct 1987); *Algrant v. Evergreen Valley Nurseries, Ltd.,* 941 F. Supp. 495, 499 (E.D. Pa 1996).

Regardless, however, of which statute of limitations is applicable, Bobrick argues that the doctrine of laches operates to bar Santana's Lanham Act claim. The District Court used the six-year statute of limitations as a guide for

27

determining whether the doctrine of laches applied here. Noting that Santana was aware of Bobrick's allegedly wrongful conduct in 1989, more than seven years before Santana brought the action, the court held that there was a presumption of laches. *Santana,* 249 F. Supp. 2d at 501. The court first held that Santana's proffered excuse – that "it repeatedly provided notice to Bobrick that Santana considered the alleged 'fire scare' tactics to be wrongful" – could not justify the delay in bringing the action. *Id.* The court nevertheless held that laches did not bar Santana from bringing its claim because Santana proved that Bobrick did not suffer material prejudice as a result of the delay. *Id.*

Laches consists of two elements: (1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay. *Pittsburgh*, 686 F.2d at 1044. Bobrick contends that the District Court erred because it did not require Santana to disprove both elements of laches. Santana responds that the District Court did not err because Santana had to disprove only one element, and it successfully did so by proving that Bobrick did not suffer prejudice as a result of the delay.[16]

---

[16]The District Court made a finding that Santana was aware of Bobrick's allegedly wrongful conduct in 1989. *Santana*, 249 F.Supp. 2d at 501. Santana argues that there are fact issues as to when Santana knew or should have known about Bobrick's marketing activities to fix the beginning of the delay period prior to suit. Santana points out that the TPMC was not formed until late 1989 and that Bobrick received a copy of the Formica videotape in early 1990. Santana argues that it did not distribute the Formica videotape to its sales representatives until 1990, it did not produce the "You Be The Judge" videotape until 1992, and it placed other advertisements throughout the 1990's.

The length of the delay is a question of fact which is

We conclude that the District Court erred because it did not use the appropriate legal standard to assess Bobrick's laches defense. Once the statute of limitations has expired, the defendant "enjoys the benefit of a presumption of inexcusable delay and prejudice. *EEOC v. The Great Atlantic & Pacific Tea Co.*, 735 F.2d 69, 80 (3d Cir. 1984). The District Court correctly found that there was a presumption of laches as a result of Santana filing the claim after the applicable statute of limitations – 6 years under the UTPCPL – had run. Santana, therefore, carried the burden of proving that its delay was excusable *and* that it did not prejudice Bobrick. *Gruca v. United States Steel Corp.,* 495 F.2d 1252, 1258-59 (3d Cir. 1974) (noting that the length of the delay

reviewed under the clearly erroneous standard. *Churma v. United States Steel Corp.*, 514 F.2d 589, 593 (3d Cir. 1975). The District Court's finding as to when Santana was aware of Bobrick's conduct is not clearly erroneous. As early as March, 1989, Santana was aware of Bobrick's "fire scare" campaign. On March 5, 1989, Lynch of Santana approached Bob Gillis at the American Association of School Administrators Convention, identified himself as the president of Santana, and informed Gillis that he objected "to what he considered an unfair attack on the physical properties of the polyethylene material used in the manufacture of Bobrick's toilet compartments." Lynch asked Gillis for the names of Bobrick's attorneys so that Santana's attorneys could contact them. Patrick McGartland, Santana's regional sales manager, stated in his deposition that in "either 1988 or 1989 . . . [he] was aware of that there was an effort to create this impression on the part of the potential buyer in the marketplace or the specifier that solid plastic was a fire issue."

controls burdens of proof).[17]

Santana argues, however, that, despite the running of the statute of limitations, a presumption of laches can be rebutted by showing only an absence of prejudice. Santana cites *Anaconda Co. v. Metric Tool & Die Co.*, in which the District Court, while recognizing that a defendant is entitled to a rebuttable presumption of both elements of laches, held that the plaintiff can rebut the presumption by negating "one or both" of the elements. 485 F.Supp. 410, 427-28 (E.D. Pa 1980) (Becker, J.). The court reasoned:

> [R]equiring the plaintiff to carry this double burden would be inconsistent with the conceptual structure of the laches doctrine, which requires the court to find both inexcusable delay on the part of the plaintiff and prejudice to the defendant. If a plaintiff rebuts the presumption as to either of the two elements, the court cannot find that both elements exist, and therefore cannot uphold the defense of laches.

*Id.* at 428 n.14.

Nevertheless, despite the reasoning of the District

---

[17] This added presumption that both inexcusable delay and prejudice exist is enjoyed by a defendant once the statute of limitations has run. *See EEOC v. The Great Atlantic & Pacific Tea Co.*, 735 F.2d at 80. It is because of this presumption that we do not agree with the position of the dissent that Santana had only to demonstrate that prejudice to Bobrick did not exist. Once the statute of limitations has run, the defendant's burden doubles.

Court in *Anaconda*, we have consistently held that a plaintiff must prove that laches does not exist by showing that its delay was excusable *and* that its delay did not prejudice the defendant. See *Great Atlantic & Pacific Tea Co.*, 735 F.2d at 80 ("If a statutory limitations period that would bar legal relief has expired . . . the burden shifts to the plaintiff to justify its delay and negate prejudice."); *Churma v. United States Steel Corp.*, 514 F.2d 589, 593 (3d Cir. 1975) ("Prior to the running of the statute, the defendant has to prove laches, but thereafter the plaintiff has to disprove laches."); *Gruca v. United States Steel Corp..*, 495 F.2d 1252, 1259 (3d Cir. 1974) ("If a plaintiff sleeps on his rights for a period of time greater than the applicable statute of limitations, then 'the plaintiff (must) . . . come forward and prove that his delay was excusable and that it did not . . . prejudice the defendant.'") (citation omitted); *Burke v. Gateway Clipper, Inc.*, 441 F.2d 946, 949-50 (3d Cir. 1971) ("We are aware that other circuits place the burden of proving inexcusable delay and prejudice on the defendant. We see no new and compelling reason to reverse the well-established principle and thoroughly considered line of decisions of this Circuit requiring the plaintiff to disprove inexcusable delay and lack of prejudice to the defendant when, as here, . . . [the statute of limitations period has run]."); *Mroz v. Dravo Corp.*, 429 F.2d 1156, 1160 (3d Cir. 1970) (never addressing whether plaintiff rebutted presumption of prejudice because plaintiff did not rebut presumption of inexcusable delay); *Lipfird v. Mississippi Valley Barge Line*, 310 F.2d 639, 642 (3d Cir. 1962) (holding that delay beyond the applicable statute of limitations period bars plaintiff's claim "unless he overcomes the presumption of inexcusable delay and detriment to the defendant resulting from the delay by pleading and proving facts which do excuse the delay and show that it has been in no way detrimental to the defendant"); *Kane v. Union of Soviet Socialist Republics*, 189 F.2d 303, 307 (3d Cir. 1951)

31

(affirming district court's dismissal of plaintiff's claim based on laches because it did not "plead[] facts negativing prejudice and excusing his delay.").

In all of our cases addressing this issue, we have held that the plaintiff's burden to rebut the presumption of laches is conjunctive. Not once have we used the word "or." The District Court concluded that Santana's delay in filing its Lanham Act claim was inexcusable. The proper conclusion then is that Santana's Lanham Act claim is barred by laches.

## C. Tortious Interference With Prospective Contract Claim

Even though we have held that the *Noerr/Pennington* doctrine shields petitioning activity from liability for claims of tortious interference with contract and tortious interference with prospective economic advantage, *see Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999), we do not need to decide whether the marketing campaign at issue here is petitioning activity which the doctrine immunizes. For even if the defendants are not shielded from liability, we agree with the District Court that Santana did not prove the existence of a prospective contractual relation.[18]

There is only one prospective contract with which Santana claims Bobrick interfered. Specifically, Santana tried to bid on a contract at the Rio Hondo Community College in California. The architect for the project originally specified HDPE toilet partitions. However, the architect changed the specification to phenolic after watching a

_____

[18]Aside from proving the existence of a prospective contractual relation, a plaintiff must prove the defendant had the purpose or intent to harm the plaintiff by preventing the relation from occurring, the absence of privilege or justification on the part of the defendant, and actual damage resulting from the defendant's conduct. *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa 1979).

videotape and conducting a fire test on samples of HDPE, which Santana had provided, and samples of phenolic, which Bobrick had provided. Penner Partitions, a supplier of phenolic partitions, ultimately won the contract. Santana argues that it lost this contract as a result of Bobrick's "fire scare" tactics.

A prospective contractual relation "is something less than a contractual right, something more than a mere hope." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa 1979). To determine whether Santana had a prospective contractual relation with Rio Hondo, "Santana must show that an issue of fact exists as to whether, but for Bobrick's 'fire scare' campaign, there was a reasonable probability that Santana would secure a contract from Rio Hondo." *Santana*, 249 F.Supp.2d at 543. It need not be certain that Santana would have obtained the contract, only reasonably probable. *Alvord-Polk*, 37 F.2d at 1015.

Santana argues it was reasonably probable that it would have obtained the contract but for the defendant's marketing campaign because it had approximately 60% of the HDPE market segment, had a favorable track record with the customer, and had actually been specified.

Despite the specification of HDPE for the Rio Hondo project, we cannot say, however, that it was reasonably probable that Rio Hondo was going to award the contract to Santana. Even though Santana had convinced Rio Hondo to specify its partitions, Santana did not have a "reasonable probability of *obtaining* the contract" for the work. *General Sound Telephone Co. v. AT&T Communications, Inc.*, 654 F.Supp. 1562, 1565 (E.D. Pa 1987). Because Bobrick persuaded Rio Hondo to change the specification to phenolic instead of HDPE, Santana was simply denied an opportunity to bid. However, even if Santana had had the opportunity to bid, one of the two other suppliers of HDPE partitions –

Capital Partitions or Comtec[19] – could still have obtained the contract. There is no evidence that Santana would be the winning bidder. The problems with obtaining a government contract in this situation is demonstrated by the fact that Rio Hondo did not in fact award the contract to Bobrick .

## V. Conclusion.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of the defendants on Santana's § 1 Sherman Act claim and tortious interference with prospective contract claim. Because we conclude, however, that the Lanham Act claim is barred by the doctrine of laches, we will vacate the order granting *Noerr/Pennington* immunity to defendants insofar as the § 43(a) claim applied to government contracts and we will vacate the order denying summary judgment to defendants insofar as the § 43(a) claim applied to private contracts. We will remand the Lanham Act claim to the District Court to dismiss it as barred by laches.

---

[19]Comtec, which had supplied HDPE partitions to the three companies that had stopped selling the HDPE partitions, entered the toilet partition market to sell HDPE partitions in their place.

Chertoff, Circuit Judge, *dissenting in part.*

I join the majority insofar as it affirms summary judgment on Santana's claims under Section One of the Sherman Act. I do not agree, however, that laches bars Santana's Lanham Act claim. Specifically, I do not believe that either logic or this Court's jurisprudence requires a plaintiff who bears the burden of showing that laches does not apply to show that *both* conditions necessary for the application of laches do not exist. And since the District Court determined that Bobrick had not suffered prejudice—and the Court's determination was not an abuse of discretion—the doctrine of laches should not bar Santana's claim.

"The doctrine of laches consists of two essential elements: (1) inexcusable delay in instituting suit; and (2) prejudice resulting to the defendant from such delay." Central Pennsylvania Teamsters Pension Fund v. McCormick Dray Line, Inc., 85 F.3d 1098, 1108 (3d Cir. 1996). If a plaintiff filed suit before the analogous state statute of limitations had run, the defendant bears the burden of showing that plaintiff's delay in instituting suit was inexcusable and the defendant suffered prejudice from the inexcusable delay. Conversely, if a plaintiff filed suit after the analogous state statute of limitations had run, a presumption arises that plaintiff's delay in instituting suit was inexcusable and defendant suffered prejudice from the delay. The plaintiff then bears the burden of rebutting this presumption. See, e.g., Equal Employment Opportunity Commission v. Great Atlantic & Pacific Tea Co., 735 F.2d 69, 80-81 (3d Cir. 1984).

The majority today holds that a plaintiff who bears the burden of rebutting such a presumption must show that his delay in instituting suit was not inexcusable *and* that the

35

defendant did not suffer prejudice from the delay. The majority concludes that our precedent compels this conclusion.

To be sure, language in our prior decisions tends to support the majority's holding. As cited by the majority, we wrote in Burke v. Gateway Clipper, 441 F.3d 946, 949 (3d Cir. 1971), in language we quoted in Churma v. United States Steel Corp., 514 F.2d 589, 593 (3d Cir. 1975) and Gruca v. United States Steel Corp., 495 F.2d 1252, 1259 (3d Cir. 1974), that a plaintiff who bears the burden of proof must "come forward and prove that his delay was excusable and that it did not unduly prejudice the defendant." Likewise, in Lipfird v. Mississippi Valley Barge Line Co., 310 F.2d 639, 642 (3d Cir. 1962), and Kane v. Union of Soviet Socialist Republics, 189 F.2d 303, 307 (3d Cir. 1951), we affirmed dismissals where the plaintiff failed to allege "any facts excusing his delay and showing lack of prejudice to the defendant."

We are "bound by holdings," however, "not language." Alexander v. Sandoval, 532 U.S. 275, 282 (2001). On this point, I agree with the District Court's conclusion in Baczor v. Atlantic Richfield Co., 424 F. Supp. 1370 (E.D. Pa. 1976), that the references to rebutting both prongs of the test are dicta in these cases, rather than holdings which bind the Court. Id. at 1380 n.5; see also Anaconda Co. v. Metric Tool & Die Co., 485 F. Supp. 410, 428 n.14 (E.D. Pa. 1980) (agreeing with Baczor). In each case -- Churma, Gruca, Burke, Lipfird and Kane -- the plaintiff did not rebut either the delay or the prejudice prong, meaning that the Court did not need to determine the issue that is before the Court today.

Even if one could read our prior cases as requiring the plaintiff to rebut both prongs of the laches test, see, e.g. Mroz v. Dravo Corp., 429 F.2d 1156, 1161 (3d Cir. 1970) (not considering prejudice prong when, but not necessarily because, plaintiff had not rebutted delay prong), such a

36

reading would be logically inconsistent with the Court's subsequent holding in <u>Central Pennsylvania Teamsters</u> that each prong is an "essential element[]" of the doctrine of laches, 85 F.3d at 1108.  It simply defies elementary logic to require a plaintiff bearing the burden of proof on rebuttal to show that the defendant cannot invoke the laches doctrine because both essential elements are missing, when one missing element would negate the doctrine.  As Judge Becker explained in <u>Anaconda</u>:

> [R]equiring the plaintiff to carry this double burden would be inconsistent with the conceptual structure of the laches doctrine, which requires the court to find both inexcusable delay on the part of the plaintiff and prejudice to the defendant. If a plaintiff rebuts the presumption as to either of the two elements, the court cannot find that both elements exist, and therefore cannot uphold the defense of laches.

485 F. Supp. at 428 n.14.  Put differently, if two conditions must be satisfied for a rule to apply, then (even if we presume both to be satisfied) negation of either of those conditions (by rebutting that presumption) defeats application of the rule.

Therefore, because the majority has concluded that the older cases require the plaintiff to rebut both prongs of the laches test, I recommend that the Court consider *en banc* whether the older cases can be reconciled with our decision in <u>Central Pennsylvania Teamsters</u>.

Here, the District Court concluded that Santana "proffered sufficient evidence that Bobrick did not suffer material prejudice as a result of the delay." (App. 79.)  I do not believe that in reaching that conclusion the District Court abused its discretion, which is the standard of review we must apply.  See <u>Churma</u>, 514 F.2d at 593.

37

Having concluded that laches does not bar Santana's Lanham Act claim, I would address the merits of Santana's appeal on the application of the <u>Noerr</u>-<u>Pennington</u> doctrine to the Lanham Act claim.


I